EISENBERG & BAUM, LLP
Andrew Rozynski, Esq.
24 Union Square East, Penthouse
New York, New York 10003
(212) 353-8700
arozynski@eandblaw.com
Attorneys for Plaintiff Maria Wilson-Cadet

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| MARIA WILSON-CADET,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY HOSPITAL, COMPLETE CARE AT EAST ORANGE LLC d/b/a COMPLETE CARE AT ORANGE PARK, and COMPLETE CARE MANAGEMENT LLC,<br><br>Defendants. | : | Civil Action No. 26-12391<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Maria Wilson-Cadet, by and through her attorneys Eisenberg & Baum, LLP, alleges as follows.

## PRELIMINARY STATEMENT

1. Maria Wilson-Cadet is Deaf. She communicates in American Sign Language. She does not read lips, and she does not learn what a doctor has said by reading a note passed to her on paper.

2. American Sign Language is a language, not a gesture system. It is visual, three-dimensional and non-linear, and its grammar and syntax are not those of English. Many Deaf people are educated in Deaf schools and grow up in culturally Deaf environments, and for reasons both physical and environmental they often do not achieve command of written English. It is hard

to learn how English works if you have never heard it. The same people converse in ASL with complete fluency.

3. That is why, in hospitals and in nursing facilities, handing a Deaf patient a notepad does not accomplish what the staff believe it accomplishes. Assessments, intake, medication, therapy, care planning and consent are the kinds of information that require an interpreter, and the law has said so for decades.

4. On October 17, 2022 Ms. Wilson-Cadet was struck by a motor vehicle while walking. She was taken to University Hospital in Newark with fractures of both femurs and of her left lower leg, and she remained there as an inpatient for approximately six and a half weeks. On or about December 1, 2022 she was discharged to a skilled nursing facility in East Orange operated under the name Grove Park Healthcare and Rehabilitation Center. About a week later she was moved by ambulance to a second East Orange facility, the one operated by Complete Care At East Orange LLC under the name Complete Care at Orange Park, where she remained until on or about March 23, 2023.

5. Across both stays she was treated, medicated, examined, moved, billed and asked to sign things. What she was not given was a way to understand any of it. For most of the forty-six days she lay in a trauma unit at University Hospital, no qualified interpreter was provided. At Complete Care she was left to shout for help because no accessible call system was placed in her room, she received medication without explanation, and when her daughter asked in writing that an interpreter be provided, the facility offered a video relay telephone service that is not an interpreting service at all.

6. Six days after that request, on February 27, 2023, the facility reported that it had spoken with Ms. Wilson-Cadet through an interpreter. It had arranged that conversation for one

purpose: to ask her to turn her monthly Social Security income over to the facility. When she declined, she was told her discharge would be planned. Nothing comparable was ever arranged so that she could understand her medications, her treatment, her therapy or her rights.

7. This action is brought under Section 1557 of the Patient Protection and Affordable Care Act and the New Jersey Consumer Fraud Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. sections 1331 and 1343, and over the state law claims under 28 U.S.C. section 1367 because they arise from the same case or controversy.

9. Venue is proper in this District under 28 U.S.C. section 1391(b) because each defendant resides in this District and because the events giving rise to the claims occurred here.

10. Assignment to the Newark vicinage is appropriate under L. Civ. R. 40.1 because the events occurred in Essex County.

## TIMELINESS

11. Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. section 18116, was enacted in 2010. It created a freestanding federal prohibition on discrimination in any health program or activity receiving Federal financial assistance, and a private right of action to enforce that prohibition. Neither the prohibition nor the right of action existed before that enactment.

12. Plaintiff's federal claims are brought under Section 1557 and were made possible by it. Section 1557 prescribes no limitations period. The four year period of 28 U.S.C. section 1658(a), which governs a civil action arising under an Act of Congress enacted after December 1, 1990, therefore applies.

13. The conduct alleged against University Hospital occurred between October 17, 2022 and on or about December 1, 2022, and continued throughout that admission. The conduct alleged against the Complete Care defendants occurred between on or about December 8, 2022 and on or about March 23, 2023, and continued throughout that residence. This action is filed within four years of the first day of the earlier of those periods and within four years of every day that followed.

14. The Consumer Fraud Act claim is governed by the six year period of N.J.S.A. 2A:14-1 and is timely.

**PARTIES**

15. Plaintiff Maria Wilson-Cadet is a Deaf adult who at all relevant times resided in Newark, New Jersey. She is an individual with a disability. Her primary language is American Sign Language.

16. Defendant University Hospital is a public institution located at 150 Bergen Street, Newark, New Jersey. It operates an acute care hospital and a Level I trauma center. It receives federal financial assistance, including payments under Medicare and Medicaid, and is a health program or activity receiving Federal financial assistance within the meaning of 42 U.S.C. section 18116.

17. Defendant Complete Care At East Orange LLC is a New Jersey limited liability company, registry number 0450582506, formed on December 29, 2020, with a principal business address of 229 Route 70, Toms River, New Jersey. Its registered agent for service is Corporation Service Company, Princeton South Corporate Center, Suite 160, 100 Charles Ewing Boulevard, Ewing, New Jersey 08628.

18. Complete Care At East Orange LLC does business under the registered alternate name Complete Care at Orange Park. That alternate name was filed with the New Jersey Division

of Revenue and Enterprise Services in 2021 and was in effect throughout the period alleged here. It operates the skilled nursing facility at 140 Park Avenue, East Orange, New Jersey, which is licensed by the New Jersey Department of Health as facility NJ60722 and certified by the Centers for Medicare and Medicaid Services under provider number 315178.

19. Defendant Complete Care At East Orange LLC is a health program or activity receiving Federal financial assistance within the meaning of 42 U.S.C. section 18116. It participates in Medicare and Medicaid and receives payments under both programs.

20. Defendant Complete Care Management LLC is a New Jersey limited liability company, registry number 0450119677, formed on November 15, 2016. It shares a principal business address with Complete Care At East Orange LLC at 229 Route 70, Toms River, New Jersey, and it shares the same registered agent for service, Corporation Service Company, Princeton South Corporate Center, Suite 160, 100 Charles Ewing Boulevard, Ewing, New Jersey 08628. Its manager of record is Shalom Stein, at the same Toms River address.

21. Upon information and belief, Complete Care Management LLC at all relevant times participated in the operation and management of the skilled nursing facility known as Complete Care at Orange Park, established or approved the administrative policies under which that facility operated, including its policies governing auxiliary aids and services for residents with disabilities, its resident call system, its language assistance services and its billing and collection practices, and is a recipient of Federal financial assistance subject to the requirements of 42 U.S.C. section 18116. Plaintiff pleads this on information and belief on the following foundation. The two entities share a principal office at 229 Route 70, Toms River, New Jersey, and share the same registered agent for service. Shalom Stein is the manager of record of Complete Care Management LLC and is disclosed to the Centers for Medicare and Medicaid Services as holding managing control of the

governing body of the facility bearing provider number 315178 and as a corporate officer of that facility. The individual who served as the facility's Administrator during Ms. Wilson-Cadet's residence is disclosed to the same agency as holding operational and managerial control of that facility. A person using a completecaremgmt.com electronic mail address was included in the correspondence concerning Ms. Wilson-Cadet's care. And the facility is presented to the public under the common Complete Care brand and through a common corporate website.

22. Complete Care At East Orange LLC and Complete Care Management LLC are referred to together as the Complete Care defendants.

23. Non-party Park Grove Healthcare & Rehabilitation Center LLC, a New Jersey limited liability company, registry number 0450385035, does business under the registered alternate name Grove Park Healthcare and Rehabilitation Center and operates a skilled nursing facility at 101 North Grove Street, East Orange, New Jersey, under National Provider Identifier 1982263000. Ms. Wilson-Cadet was a resident of that facility for a brief period beginning on or about December 1, 2022. Plaintiff reserves the right to amend to assert claims against that entity should the facts developed in discovery warrant it.

## FACTUAL ALLEGATIONS

### *A. American Sign Language, and how Ms. Wilson-Cadet communicates*

24. Ms. Wilson-Cadet has been Deaf since childhood. American Sign Language is the language in which she thinks, converses and understands.

25. ASL is a distinct language. It is visual, three-dimensional and non-linear, and its grammar and syntax are not those of English. A person fluent in ASL is not thereby fluent in written English, and a person handed a note in English is not thereby communicated with.

26. Ms. Wilson-Cadet does not read lips. Written English is not an effective substitute for ASL for her. Handing her a notepad does not tell her what a physician has just said, what a medication is for, or what she is being asked to agree to.

27. Her daughter, Jennifer Wilson, is not an interpreter and cannot interpret for her. Ms. Wilson told the facility so in writing.

28. A qualified interpreter is the auxiliary aid that permits Ms. Wilson-Cadet to understand and be understood in a medical setting. She requested one. The request was not honored.

***B. Six and a half weeks at University Hospital***

29. On October 17, 2022 Ms. Wilson-Cadet was struck by a motor vehicle in Newark. She was a pedestrian. She carried no automobile insurance of her own.

30. She was transported to University Hospital and admitted. Her injuries included a fracture of the shaft of the right femur, a fracture of the shaft of the left femur, and a fracture of the left lower leg.

31. Injuries of that kind require operative fixation, a period of intensive care, a prolonged period during which the patient cannot bear weight, and a discharge to skilled nursing rather than a discharge home. Ms. Wilson-Cadet remained an inpatient at University Hospital until on or about December 1, 2022, when she was discharged directly to a skilled nursing facility. Her admission lasted approximately forty-six days.

32. Her deafness was known to University Hospital from the day she arrived. It was recorded in her chart, and it was apparent to every member of the staff who came to her bedside.

33. Over those six and a half weeks she was operated on, anesthetized, medicated, examined, X-rayed, repositioned, moved through the hospital, evaluated by therapists, and asked to agree to things. The particulars are recorded in the Hospital's own chart.

34. For most of that admission University Hospital did not provide Ms. Wilson-Cadet with a qualified sign language interpreter, in person or by video remote interpreting.

35. Hospital staff relied instead on writing, on gestures, and on family members. Ms. Wilson-Cadet told hospital staff that she needed a sign language interpreter. Members of her family told hospital staff the same thing. None of the methods the Hospital used allowed Ms. Wilson-Cadet to understand what was being done to her or to take part in decisions about her own care.

36. A patient who cannot walk, cannot leave her bed, and cannot hear depends entirely on the people around her for information about her own body. Ms. Wilson-Cadet spent a month and a half in that position without a reliable way to ask a question or to understand an answer.

37. She did not understand what medications she was being given or why. She did not understand what was done in the operating room or what was found. She did not understand what her prognosis was, what she was permitted to do with her legs, or what her therapy was meant to accomplish. When she was discharged, she did not understand where she was being sent or why.

38. Upon information and belief, University Hospital had contracted interpreter services available to it throughout Ms. Wilson-Cadet's admission and maintained a policy governing communication with patients who are Deaf or hard of hearing. Plaintiff pleads this on information and belief based on the Hospital's size, its status as a Level I trauma center, and its receipt of federal health care funding, and will seek those materials in discovery.

***C. Two facilities, and the admission to Complete Care at Orange Park***

39. On or about December 1, 2022 Ms. Wilson-Cadet was discharged from University Hospital to a skilled nursing facility at 101 North Grove Street, East Orange, New Jersey, operated under the name Grove Park Healthcare and Rehabilitation Center.

40. She did not stay there. On December 8, 2022 she was moved by ambulance.

41. She was admitted to the skilled nursing facility at 140 Park Avenue, East Orange, New Jersey, operated by Complete Care At East Orange LLC under the name Complete Care at Orange Park, on or about December 8, 2022. Her attending physician recorded an initial nursing facility visit there on December 14, 2022.

42. She remained a resident of Complete Care at Orange Park until on or about March 23, 2023, when she was discharged home with home health services that continued through April 22, 2023.

43. She was admitted for rehabilitation of the injuries she sustained in the collision.

44. Admission paperwork was presented at the time of her admission. Upon information and belief, no qualified interpreter was provided to explain those documents to Ms. Wilson-Cadet before they were signed. Plaintiff pleads this on information and belief based on the facility's reliance on written notes throughout her residence and on its response to the written interpreter request described below.

45. The facility knew Ms. Wilson-Cadet was Deaf from the moment of her admission. Her deafness was recorded in her chart, and it was apparent to every member of the staff who encountered her.

46. The facility markets itself to residents and families on the quality of its relationships with residents. Its published materials state that at Complete Care at Orange Park the operator prides itself on the relationships it builds with its residents and staff, that through frequent site

visits and a hands on approach from its top leadership it creates strong connections with residents and staff, and that by creating a loyal and approachable environment it ensures everyone feels like family.

47. Ms. Wilson-Cadet and her family selected the facility in reliance on those representations.

***D. No accessible way to call for help***

48. Ms. Wilson-Cadet could not summon staff from her bed. No visual or vibrating call device was placed in her room, and she was given no other accessible means of calling for help. To obtain assistance, including assistance with incontinence care, she had to shout and hope that someone happened to be within earshot.

49. The call system available in her room depended on hearing a spoken response. A resident presses a button and speaks, and a voice answers. That arrangement did not work for Ms. Wilson-Cadet, who could neither hear the response nor speak the request.

50. On January 9, 2023 her daughter wrote to the facility about exactly this. She stated that her mother was having difficulty getting her incontinence products changed, that she had to shout for any form of assistance, which was unacceptable, and that she required a nurse pager which she did not have in her room.

51. The same message told the facility that all of the requests the family had made to assist Ms. Wilson-Cadet had not been met since the beginning of her stay, that the family kept receiving promises that were not fulfilled, and that Ms. Wilson-Cadet was taking medication without explanation.

52. The facility did not provide an accessible call device in response.

53. Ms. Wilson-Cadet continued to receive medication she did not understand. No interpreter was provided to explain to her what she was being given or why.

***E. The written interpreter request, and what the facility did with it***

54. On February 15, 2023, a person identifying herself as writing from the billing office at Complete Care sent Ms. Wilson-Cadet's family an invoice for Ms. Wilson-Cadet's Social Security income. The message stated that as per Medicaid regulations, her income, minus fifty dollars, must be paid to the nursing home each month while she is there.

55. On February 21, 2023 Ms. Wilson-Cadet's daughter responded in writing, twice, within four minutes. She wrote that an interpreter must be provided to explain the breakdown of the income payment, that she was unable to interpret for her mother, and that her mother must be provided with an interpreter in order to comprehend the explanation of the process. She added that writing in a notepad would not help her mother understand what was going on.

56. That request was addressed to the facility's social services staff and to the billing office, and copied to the facility's Administrator, Yehuda Gottlieb, to the facility's social worker, Barbara Hyde, to Makagbe Swaray, and to Ms. Wilson-Cadet herself.

57. The Administrator of the facility therefore had written notice, on February 21, 2023, that a Deaf resident in his facility needed an interpreter and that written notes were not working.

58. Six days later, on February 27, 2023, the facility's staff wrote back. They reported that they had been able to speak to Ms. Wilson-Cadet regarding turning over the Social Security income using an interpreter, that she was clear in her understanding, and that she let them know she would not turn over the income to the facility. Plaintiff pleads the facility's report as the facility made it and does not adopt the facility's characterization of the means it used.

59. The same message stated that the facility had advised Ms. Wilson-Cadet that it would have to start planning her discharge, because any Social Security and or pension have to be turned over to the facility.

60. Whatever means the facility used on February 27, 2023, it arranged that means within six days of being asked, and it arranged it for the conversation in which it sought Ms. Wilson-Cadet's money. It arranged nothing comparable to explain her medications, her treatment, her therapy, or her rights.

61. On February 28, 2023 Ms. Wilson-Cadet's daughter wrote again. She reported that her mother had told her the facility was attempting to use the interpreter from Sorenson video relay, which cannot be used as a personal interpreting service.

62. Sorenson video relay service is a telecommunications relay service. It exists to connect a Deaf person by telephone to a hearing person somewhere else. It is not a face to face interpreting service, and it cannot be used as one.

63. The same message told the facility that the family had inquired numerous times for interpreting services so that clarity of understanding between the institution and Ms. Wilson-Cadet could be achieved, and asked why the institution provided a telephone translating service for residents who do not speak English but not for residents with disabilities.

64. The facility had a language line for residents who spoke languages other than English. It did not provide a qualified sign language interpreter for a Deaf resident.

65. No one from the facility answered that message. The record contains no response.

***F. The money***

66. Throughout her residence, Ms. Wilson-Cadet was required to pay her monthly Social Security income, less a fifty dollar personal needs allowance, to the facility.

67. The statement made to Ms. Wilson-Cadet on February 27, 2023, that any Social Security and pension income had to be turned over to the facility, overstated her obligation. The Complete Care defendants' own billing office had described that obligation correctly on February 15, 2023: her income, less fifty dollars, was payable to the facility each month while she was a resident.

68. On March 15, 2023 the billing office sent a further invoice for Ms. Wilson-Cadet's income balances and offered a payment plan, including an offer to charge a debit or credit card monthly.

69. Ms. Wilson-Cadet paid. Each month of her residence, her Social Security income less the fifty dollar personal needs allowance was paid to the facility. The amounts are recorded in the facility's own invoices and billing records.

70. She paid for a residential health care service that she could not understand and in which she could not meaningfully participate.

71. Separately, and after the settlement of her personal injury claim, the United States withheld a portion of her monthly Social Security benefit to satisfy a Medicare conditional payment demand arising from the same treatment. The remaining balance was waived on February 10, 2026.

***G. Care planning without her***

72. Skilled nursing facilities hold care plan meetings at which a resident's treatment, therapy and discharge are discussed. A meeting concerning Ms. Wilson-Cadet was scheduled for March 8, 2023.

73. Her daughter advised the facility in advance that she would attend by video rather than in person.

74. Upon information and belief, no qualified interpreter was present at that meeting. Plaintiff pleads this on information and belief based on the facility's conduct throughout her residence and on the correspondence that followed the meeting, which concerned insurance authorization for therapy and records no interpreter having been provided.

75. Ms. Wilson-Cadet was not able to take part in planning her own care on equal terms with a hearing resident.

### *H. What it cost her*

76. Ms. Wilson-Cadet paid the monthly price of a residential health care service she could not meaningfully use. She paid the same amount a hearing resident paid, for materially less than a hearing resident received.

77. She was denied the opportunity to participate in her own treatment. She took medication without knowing what it was. She underwent therapy she could not have explained back to anyone. She called for help by shouting.

78. She was discharged on or about March 23, 2023 and required home health services through April 22, 2023.

79. She was told that her continued residence depended on turning over her income, and that her discharge would be planned if she did not.

80. What Ms. Wilson-Cadet was promised, and in the case of the Complete Care defendants what she paid for, was participation in her own care. What she received was care delivered around her rather than to her. The difference between those two things is the loss.

## COUNT I

## Violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. section 18116 (Against University Hospital)

81. Plaintiff repeats and realleges each preceding paragraph.

82. Section 1557 of the Affordable Care Act, 42 U.S.C. section 18116, prohibits any health program or activity receiving Federal financial assistance from excluding a person from participation in, denying her the benefits of, or subjecting her to discrimination under that program on the ground prohibited by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. section 794.

83. University Hospital is a health program or activity receiving Federal financial assistance.

84. Ms. Wilson-Cadet is an individual with a disability and was at all relevant times otherwise qualified to receive the services University Hospital provides.

85. A covered entity must furnish appropriate auxiliary aids and services, including qualified interpreters, where necessary to afford an individual with a disability an equal opportunity to participate in and benefit from the entity's services, and must give primary consideration to the auxiliary aid or service requested by that individual.

86. For most of Ms. Wilson-Cadet's admission, University Hospital did not provide a qualified interpreter or any other auxiliary aid adequate to permit her to understand her treatment or to participate in decisions about it.

87. Writing, gestures and reliance on family members were not effective for Ms. Wilson-Cadet. University Hospital was told so by Ms. Wilson-Cadet and by members of her family during the admission.

88. University Hospital acted with deliberate indifference. It had actual knowledge that Ms. Wilson-Cadet was Deaf, from her chart and from every encounter its staff had with her at her bedside. It had actual knowledge that she was asking for a sign language interpreter, because she asked for one and her family asked for one. It had actual knowledge that the methods it was using

instead were not working, because it was told so and because the failure repeated itself at her bedside every day for approximately forty-six days. Upon information and belief it had interpreter services available to it and did not use them for her. Its failure to provide a qualified interpreter across an admission of that length was a choice and not an oversight.

89. As a direct and proximate result, Ms. Wilson-Cadet was denied meaningful access to the hospital's services and was denied the opportunity to participate in her own medical care.

90. University Hospital failed to implement or to follow the policies, procedures and staff training necessary to ensure compliance with Section 1557 and its implementing regulations.

91. A patient who enters a hospital bargains for more than the physical administration of treatment. She bargains for the ability to understand what is being done to her, to ask a question, to weigh an option, to refuse, and to take part in decisions about her own body. That is the benefit a hospital undertakes to provide when it admits a patient, and it is the benefit Ms. Wilson-Cadet was denied.

92. Ms. Wilson-Cadet had an expectation interest in the ability to participate fully in her own medical care through effective communication. University Hospital denied her that ability for approximately forty-six days.

93. She is entitled to compensatory damages for the opportunity she lost when she was denied the ability to meaningfully access and participate in her own treatment, together with nominal damages, declaratory relief, and reasonable attorneys' fees, costs and disbursements.

**COUNT II**

**Violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. section 18116 (Against the Complete Care Defendants)**

94. Plaintiff repeats and realleges the allegations of the preceding paragraphs, other than the allegations set forth under Count I.

95. Each of the Complete Care defendants is a health program or activity receiving Federal financial assistance. Complete Care At East Orange LLC participates in and receives payment from Medicare and Medicaid. Complete Care Management LLC, upon information and belief, operates and manages the facility and receives Federal financial assistance in that capacity.

96. Ms. Wilson-Cadet is an individual with a disability and was at all relevant times otherwise qualified to receive the services the facility provides.

97. The Complete Care defendants were required to furnish appropriate auxiliary aids and services, including qualified interpreters, where necessary to afford her an equal opportunity to participate in and benefit from its services, and to give primary consideration to the auxiliary aid she requested.

98. The Complete Care defendants did not provide a qualified interpreter for her medical care, her medications, her therapy, or her care planning.

99. The Complete Care defendants offered a telecommunications relay service in place of an interpreter. A video relay service designed to carry telephone calls is not a qualified interpreter and does not afford effective communication in a face to face clinical setting.

100. The Complete Care defendants provided no accessible means for Ms. Wilson-Cadet to summon staff, while providing an audible call system to hearing residents.

101. The Complete Care defendants maintained a telephone interpreting service for residents with limited English proficiency and did not make comparable provision for a Deaf resident.

102. Upon information and belief, the policies and practices described in the four preceding paragraphs, governing auxiliary aids and services, the resident call system and language assistance at Complete Care at Orange Park, were established or approved by Complete Care Management LLC and were applied at the facility under its direction. Plaintiff pleads this on information and belief on the foundation stated in the PARTIES section above.

103. The Complete Care defendants acted with deliberate indifference. The facility's Administrator had actual knowledge, in writing on February 21, 2023, that a Deaf resident in his facility needed a sign language interpreter and that writing on a notepad was not working. The facility had actual knowledge, in writing on January 9, 2023, that she had no accessible way to call for help and was taking medication without explanation. Within six days of the February 21 request the facility arranged interpretation for a conversation about her income, and it arranged nothing comparable for her care. On February 28, 2023 it received a further written complaint identifying the failure and it did not respond.

104. As a direct and proximate result, Ms. Wilson-Cadet was denied meaningful access to the Complete Care defendants' services, was denied the opportunity to participate in her own care, and paid for a service she could not meaningfully use.

105. The Complete Care defendants failed to implement or to follow the policies, procedures and staff training necessary to ensure compliance with Section 1557 and its implementing regulations.

106. A resident who enters a skilled nursing facility, and pays for it, bargains for more than a bed. She bargains for rehabilitation she can follow, medication she understands, a way to summon help, and a place in the planning of her own care. That is what the Complete Care defendants undertook to provide and what they charged her for each month.

107. Ms. Wilson-Cadet had an expectation interest in the ability to participate fully in her own care through effective communication. The Complete Care defendants denied her that ability for the duration of her residence, while charging her the same price a hearing resident paid.

108. She is entitled to compensatory damages for the opportunity she lost when she was denied the ability to meaningfully access and participate in the services she purchased, for the difference between the value of what she paid for and the value of what she received, and to nominal damages, declaratory relief, and reasonable attorneys' fees, costs and disbursements.

**COUNT III**

**Violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. (Against the Complete Care Defendants)**

109. For purposes of this Count only, Plaintiff realleges and incorporates the paragraphs of this Complaint set forth under the headings PARTIES, Section A, Section C, Section D, Section E and Section F, and only to the extent those paragraphs allege the identities of the parties; Ms. Wilson-Cadet's purchase of the Complete Care defendants' residential health care services; the representations made and the facts omitted in connection with that purchase; the administrative and operational practices of the Complete Care defendants concerning auxiliary aids, language assistance and the resident call system; the statements made in connection with the collection of payment; and Ms. Wilson-Cadet's economic loss as a consumer.

110. This Count challenges the Complete Care defendants' conduct in the sale and the billing of residential health care services. The duties at issue are the duty to refrain from deception and from unconscionable commercial practices in the sale of merchandise, and the administrative duty to furnish an interpreter. Those duties are commercial and operational. This Count does not

rest on any allegation of medical diagnosis, nursing judgment or clinical practice, seeks no damages for personal injury, and seeks only economic and benefit of the bargain relief.

111. The New Jersey Consumer Fraud Act prohibits the use of any unconscionable commercial practice, deception, fraud, false pretense, false promise or misrepresentation, and the knowing concealment, suppression or omission of any material fact with intent that others rely upon it, in connection with the sale or advertisement of any merchandise. N.J.S.A. 56:8-2.

112. Merchandise under N.J.S.A. 56:8-1(c) includes services. The residential health care services the Complete Care defendants sold to Ms. Wilson-Cadet, and the accommodations, lodging and care bundled into the monthly price she paid, are merchandise within the meaning of the Act. The Complete Care defendants are engaged in trade or commerce and sell those services to consumers and to the families who select facilities for them.

113. The first unlawful practice is a knowing omission of material fact. Before and at the time of Ms. Wilson-Cadet's admission, the Complete Care defendants knew that she was Deaf and that American Sign Language was her language. Upon information and belief, they knew at that time that they had no arrangement in place to furnish a qualified sign language interpreter to a resident, and that they would instead direct a Deaf resident to written notes and to a video relay telephone service. Plaintiff pleads that knowledge on information and belief based on the facility's uniform conduct across the whole of her residence, on its response to the written request of February 21, 2023, and on its maintenance of a telephone interpreting service for residents with limited English proficiency and of nothing comparable for a Deaf resident. The Complete Care defendants disclosed none of this to Ms. Wilson-Cadet or to her family. Whether a facility will furnish an interpreter to a Deaf resident is material to the decision to enter that facility and to

remain in it, and the Complete Care defendants omitted it with the intent that Ms. Wilson-Cadet and her family rely on its absence.

114. The second unlawful practice is a misrepresentation made to secure payment. On February 27, 2023 the facility's staff told Ms. Wilson-Cadet that any Social Security and pension income had to be turned over to the facility, and in the same communication told her that her discharge would have to be planned. That statement overstated her obligation. Federal law permits a resident's income to be applied to the cost of her care only after required deductions, which include a personal needs allowance and amounts for Medicare and other health insurance premiums, deductibles and coinsurance. 42 C.F.R. section 435.725(c). The statement made to Ms. Wilson-Cadet acknowledged none of them. The Complete Care defendants' own billing office had stated the obligation correctly on February 15, 2023: her income, less a fifty dollar personal needs allowance, was payable to the facility each month while she was a resident. A misstatement of a consumer's obligation to pay, made in order to obtain payment and paired with a statement that her housing was at risk, is a deception and an unconscionable commercial practice within the meaning of the Act.

115. The third unlawful practice is unconscionable in itself. The Complete Care defendants charged Ms. Wilson-Cadet the full monthly price of a residential health care service while withholding from her the auxiliary aid without which she could not understand, direct or take part in the service she was paying for. They furnished a telephone interpreting service to residents who did not speak English and furnished no equivalent to a resident who did not hear. To charge a consumer the full price of a service while withholding from that consumer alone the means of using it is an unconscionable commercial practice.

116. Ms. Wilson-Cadet suffered an ascertainable loss. Each month of her residence she paid the Complete Care defendants her Social Security income less the fifty dollar personal needs allowance. Those payments are quantifiable and are recorded in the Complete Care defendants' own invoices and billing records. She paid the same monthly price a hearing resident paid and received a service materially inferior to the service a hearing resident received. The difference between the price she paid and the value of what she received is an ascertainable loss of money within the meaning of N.J.S.A. 56:8-19.

117. That loss was caused by the unlawful practices alleged in this Count. Had the Complete Care defendants disclosed before admission that they would not furnish a qualified sign language interpreter and would direct a Deaf resident to a video relay telephone service, Ms. Wilson-Cadet and her family would not have selected this facility and she would not have paid this facility. Had the February 27, 2023 statement been accurate, she would not have been told that her continued residence depended on surrendering income beyond what she in fact owed. And had the Complete Care defendants furnished the interpreter that the price of the service included, she would have received what she paid for.

118. N.J.S.A. 56:8-19 entitles a person who suffers an ascertainable loss as a result of an unlawful practice to threefold the damages sustained, together with reasonable attorneys' fees, filing fees and reasonable costs of suit.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Maria Wilson-Cadet respectfully requests that this Court:

(a) Declare that defendants violated Section 1557 of the Patient Protection and Affordable Care Act;

(b) Declare that the Complete Care defendants violated the New Jersey Consumer Fraud Act;

(c) Award compensatory damages against each defendant in an amount to be determined at trial, including damages for the opportunity Ms. Wilson-Cadet lost when she was denied the ability to meaningfully access and participate in her own care, and damages measured by the difference between the value of the services she paid for and the value of the services she received;

(d) Award nominal damages;

(e) Award treble damages under N.J.S.A. 56:8-19;

(f) Award reasonable attorneys' fees, filing fees and costs of suit under 42 U.S.C. section 18116 and N.J.S.A. 56:8-19;

(g) Award pre-judgment and post-judgment interest; and

(h) Grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**CERTIFICATION PURSUANT TO L. CIV. R. 11.2**

I certify that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

Dated: September 19, 2026

Respectfully submitted,

EISENBERG & BAUM, LLP

/s/ Andrew Rozynski
Andrew Rozynski, Esq.
24 Union Square East, Penthouse
New York, New York 10003
(212) 353-8700
arozynski@eandblaw.com
Attorneys for Plaintiff